IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>RYAN D. TERRY, JEFFREY D. DAILEY, and TNT ASSOCIATES, LLC, a Nebraska Limited Liability Company,<br><br>    Defendants. | 8:20CR248<br><br>FINDINGS AND RECOMMENDATION |

  This matter is before the Court on the Motion to Suppress Evidence (Filing No. 35) filed by Defendant, Ryan D. Terry. Terry seeks suppression of statements he made during his custodial interrogation on April 21, 2020, and any evidence obtained from search and seizure warrants executed after his arrest. Terry filed a brief (Filing No. 36) in support of the motion and the government filed a brief (Filing No. 58) in opposition. The Court held an evidentiary hearing on April 20, 2021. Terry was present with his attorney, Katherine McNamara. The government was represented by Assistant United States Attorney, Matt Lierman. Omaha Police Department ("OPD") Sergeant Aaron Hanson ("Sgt. Hanson"), OPD Detective Nicholas Yarpe ("Det. Yarpe"), and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Donald Mann ("SA Mann") testified on behalf of the government. The government's Exhibits 1-8 were received by the Court without objection and Exhibit 9 was received by the Court over Terry's objection. A transcript (TR.) of the hearing was prepared and filed on May 18, 2021. (Filing No. 77). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be granted as to statements Terry made during his custodial interrogation but denied as to physical evidence obtained from the execution of the search warrants.

## BACKGROUND

  Sometime in early April 2020, Det. Yarpe[1] received information from a reliable confidential informant ("CI") that an individual known as "the coach" was selling large amounts of marijuana and was involved in money laundering. (TR. 61-62, 76-77). After further investigation, law enforcement identified "the coach" as Terry. (TR. 62-63). In the afternoon on April 21, 2020, OPD

---

[1] Det. Yarpe has been a law enforcement officer for twelve and a half years. (TR. 61).

and ATF officers undertook a coordinated operation to investigate Terry's suspected marijuana distribution. (TR. 61-62). On that date, officers arranged a controlled purchase of five pounds of marijuana for $6,700 between the CI, Terry, and defendant Jeffrey Dailey, at Daily's residence. (TR. 13-14, 63-65). Sgt. Hanson[2] of the OPD and ATF Agent Mike Parker supervised the operation, which included numerous law enforcement officers both on the ground and in the air; the Nebraska State Patrol ("NSP") conducted aerial surveillance in a plane[3] and coordinated with OPD and ATF officers on the ground who were conducting surveillance of Terry's residence and Dailey's residence. (TR. 15-17, 38-39). The officers maintained direct communication with one another by radio. (TR. 15).

Around 3:55 p.m., aerial surveillance officers radioed their observation to officers on the ground that Terry had placed a package in the back seat of his black Dodge Ram pickup truck at his residence. Terry then drove to Dailey's residence. Shortly after Terry arrived at Dailey's residence, the CI arrived for the controlled purchase. (TR. 18-19). Terry provided the CI with five pounds of marijuana, but Terry would not accept the $6,700 as payment; apparently, Terry wanted the CI to purchase a larger quantity of marijuana and provided the CI five pounds free "to see if it was good." Terry and Dailey then arranged to meet the CI later that day to deliver a larger quantity of marijuana.[4] (TR. 20, 65-66).

After the controlled purchase, surveilling officers observed Terry and Dailey both get into Dailey's vehicle, a black Chevrolet Impala, and leave Dailey's residence. (TR. 19). Surveilling officers observed Dailey and Terry drive to Terry's residence and saw Terry place at least one large duffel bag into the trunk of Dailey's Impala, which officers believed contained additional marijuana based upon the CI's discussion with Terry and Dailey during the controlled purchase. (TR. 19-20, 40). Dailey and Terry then drove away from Terry's residence in Dailey's Impala. (TR. 21).

Officers began mobilizing to conduct a traffic stop of Dailey's Impala with a K-9 Unit. (TR. 21; see generally, Ex. 1, File 222552.ts). Surveilling officers observed the Impala make a lane

---

[2] Sgt. Hanson has been a police officer in Nebraska for over twenty-four years. (TR. 13).

[3] The NSP surveillance video was received into evidence as Exhibit 1. Exhibit 1 contains three separate video files, which the Court will refer to by file name as necessary.

[4] The CI was equipped with an audio-video recording device for the controlled purchase and officers surveilled the CI during the controlled purchase. (TR. 63). This audio-visual recording was received into evidence as Exhibit 2. It is slightly unclear as to how much more marijuana Terry was going to retrieve to bring back to the CI after the controlled purchase (either twenty or thirty additional pounds), but generally it was understood that Terry and Dailey were going to have a total of fifty pounds of marijuana. (TR. 65-66; Ex. 1, File 210307.ts at 26:34).

change without properly signaling and intended to initiate a traffic stop on that basis. Before officers contacted the Impala, however, aerial surveillance officers radioed to the officers on the ground that the Impala's passenger, Terry, had exited the vehicle and was heading in a different direction on foot. (TR. 23, 44-46; Ex. 1, File 222552.ts, at 5:53). The K-9 Unit caught up to Dailey and the Impala and initiated a traffic stop. A drug canine alerted to the presence of narcotics in the Impala and a subsequent search recovered approximately fifty pounds of marijuana in plastic heat-sealed packages inside two large duffel bags in the Impala's trunk. (TR. 24). Some samples of the packages that were tested contained THC, cannabis, and CBD. (TR. 47).

Terry was apprehended by law enforcement on foot on the street and was placed in custody. Officers transported Terry to an interview room at OPD Central Station. (TR. 25). The three law enforcement officers involved with Terry's interview, Sgt. Hanson, Det. Yarpe, and SA Mann,[5] each testified that at this point Terry was under arrest and was not free to leave. (TR. 48, 84, 89, 101). Sgt. Hanson and Det. Yarpe also both testified that, to their knowledge, Terry was not provided *Miranda* warnings after he was taken into custody prior to being taken to the interview room. (TR. 26; TR. 78). Sgt. Hanson, Det. Yarpe, and SA Mann each testified that they wanted to interview Terry to attempt to get him to cooperate and/or become an informant to provide officers with information regarding his suppliers and "higher-level players" within criminal drug organizations. (TR. 26-27, 48-49, 68-69, 90).

The interview room was equipped with audio and visual recording devices that recorded the entirety of Terry's time in the interview room. This audio-visual recording was received into evidence as Exhibit 3.[6] (TR. 26). The recording starts at approximately 6:07 p.m. and begins with Terry sitting alone and unrestrained in the interview room. Terry's arm is visibly scraped. At 6:09 p.m. Terry is provided with two cups of water. Terry remains alone in the interview room until approximately 6:48 p.m. when Det. Yarpe, SA Mann, and Sgt. Hanson enter the room and introduce themselves. (Ex. 3 at 6:48 p.m.; TR. 27, 67, 90). Det. Yarpe starts by telling Terry that "there are some questions and stuff we want to ask you" and begins to "lay out" the information officers had from their investigation and surveillance of Terry. Officers do not provide Terry with a *Miranda* advisement during this time. (Ex. 3 at 6:49 to 6:50 p.m.).

---

[5] SA Mann has been a special agent with the ATF for thirteen years and is also an attorney. (TR. 89, 106).

[6] The timestamps in Exhibit 3 correspond to the time of day rather than the video's run-time.

Sgt. Hanson starts speaking immediately after Det. Yarpe, telling Terry he "ain't gonna skate on this," he is going to prison, and that he "will lose everything in [his] life the way it is now." (Ex. 3 at 6:51 to 6:52:25 p.m.). Terry responds, "Alls I know is that I was walking down the street and got pulled over by the cops." (Ex. 3 at 6:52:31 p.m.). Sgt. Hanson interrupts Terry, telling him to "stop" and not to lie. (Ex. 3 at 6:52:36 to 6:52:39 p.m.). At this point—prior to receiving a *Miranda* advisement—Terry interrupts Sgt. Hanson and says, "Before I do anything else to incriminate myself any further, I, I think I need a lawyer present." (Ex. 3 at 6:52:40-44 p.m.). After Terry makes this statement, there is a brief pause before Det. Yarpe gestures to a piece of paper on the table next to him, which was a *Miranda* Rights Advisory Form (Ex. 4), and says, "Okay, I will read you your rights, okay, and then on the last question you can give me a yes or no if you want your lawyer, okay? Like I said if you have anything on your mind that you would like to ask us, I think we just did a pretty good job of telling you what we have." (Ex. 3 at 6:52:47 to 6:53:05 p.m.; TR. 80-81). Sgt. Hanson interjects by saying, "There's something else you need to know;" Det. Yarpe continues, stating, "This isn't just a routine traffic stop where there is marijuana in the car," and tells Terry officers have the "address, surveillance, and then the stop." Det. Yarpe continues, "I understand that is your right to have a lawyer but this isn't just any normal case where you just do a traffic stop and you have two people in the vehicle, okay?" Sgt. Hanson then states, "And right now your house is surrounded." (Ex. 3 at 6:53:07-6:53:32 p.m.). Officers do not further mention *Miranda* or Terry's statement about a lawyer and continue to speak to Terry about what they observed during their surveillance and explain to Terry "how fucked you are" and that his "best play is to cooperate," in which case he may not even be indicted. (Ex. 3 at 6:53:32 to 6:56 p.m.).

Officers continued to talk to Terry until approximately 8:14 p.m., eliciting several incriminatory statements from Terry throughout, including asking him questions about the offenses for which he arrested and his knowledge about drug trafficking. Terry was left alone in the interview room at approximately 8:14 p.m. until SA Mann returned at 8:24 p.m. to ask Terry if he needed anything. Terry asked for more water and for bandages or something to clean the scrape on his arm. SA Mann left and returned with more water a couple minutes later. (Ex. 3 at 8:14 to 8:26 p.m.). SA Mann continued to talk to Terry one-on-one until 9:27 p.m., at which point SA Mann looked at the *Miranda* Rights Advisory Form that was still on the table, said, "I forgot to do this" and began giving Terry a *Miranda* rights advisory for the first time. Terry replied "yes" he

understood each *Miranda* right and "yes" he was willing to talk to SA Mann at the conclusion of the *Miranda* advisement. (Ex. 3 at 9:26:58 to 9:27:34 p.m.). SA Mann completed the bottom portion of the rights advisory form. (TR. 82; 97; Ex. 4).

After Terry agreed to talk to SA Mann, Terry asks, "What about my lawyer?" SA Mann pauses and replies, "That is tricky for me to answer." (Ex. 3 at 9:27:36-49 p.m.). Terry begins speaking next, stating his lawyer is "tightly knitted to a handful of people" or other clients that "keep close" and "would know something is going on," and tells SA Mann his lawyer's name. SA Mann replies, "My advice to everybody in your position is the less people you tell what's going on the better off and safer you will be. Does that make sense?" (Ex. 3 at 9:27:49 to 9:28:25 p.m.). SA Mann then reinitiated questioning Terry and continued the interview until approximately 9:59 p.m. when Terry asks to use the bathroom. (Ex. 3 at 9:28:45 to 9:59:18 p.m.). Terry returned to the interview room at 10:00 p.m. and was left alone until approximately 10:14 p.m. when a uniformed officer returned to place Terry in handcuffs. The audio-visual recording and officers' testimony are both clear that at no point during the interview did the officers give Terry an opportunity to contact an attorney. (Ex. 3; TR. 54, 84).

At the evidentiary hearing on Terry's motion to suppress, Det. Yarpe testified he had planned to Mirandize Terry when Det. Yarpe initially entered the room, but he and the other officers "kind of started talking over . . . each other" and Det. Yarpe got "sidetracked so I couldn't get through the rest of my questions with *Miranda*." (TR. 70). Det. Yarpe testified that, prior to reciting the rights advisory form (Ex. 4) to Terry, Det. Yarpe had filled out the top portion, including Terry's name, place of interrogation, time started, time advised of rights, and his name. Det. Yarpe testified the rights advisory form indicates the interrogation began at 6:50 p.m. and the time advised of rights was 7:30 p.m., which admittedly was not correct because he had "lost track" of the form after everyone started talking. (TR. 80-82; Ex. 4). Det. Yarpe testified his failure to properly Mirandize Terry was not intentional. (TR. 70).

SA Mann similarly testified the failure to Mirandize Terry was a mistake or "simple oversight." SA Mann testified Sgt. Hanson "interrupted" the process of Det. Yarpe completing the *Miranda* rights advisory but the conversation "kind of just kept going naturally" such that SA Mann did not realize the *Miranda* form was not finished until later. (TR. 91, 105).

Sgt. Hanson testified he believed that prior to him entering the room "an attempt was made" to advise Terry of *Miranda* using a rights advisement form, but it was "unclear as to whether or not

we were all the way through *Miranda* or not." (TR. 27-28). Sgt. Hanson testified his recollection of an attempt to advise Terry of *Miranda* using the rights advisement form would have been captured on the video recording. (TR. 28).

While Terry was being questioned, other officers sought and obtained a state search warrant for Terry's residence. (Ex. 5). The affidavit for the search warrant includes information officers gathered during their surveillance on April 21, 2020, and the evidence recovered from the traffic stop of Dailey's vehicle. Relevant to the instant motion, the affidavit also includes the information that "Post-*Miranda*, Terry indicated there was $60,000 in U.S. currency as well as THC (shatter) in a safe inside his residence[.]" (Ex. 5). The search warrant for Terry's residence was executed at 9:05 p.m., which was before Terry was advised of *Miranda* at 9:27 p.m. (TR. 87). Officers recovered over $116,000 in United States currency, containers of marijuana, THC edibles and wax, and other items consistent with drug sales during the search of Terry's residence. (Ex. 5; Ex. 6). On April 24, 2020, law enforcement secured a state search warrant for the cell phone Terry had on his person when he arrested on April 21, 2020. (Ex. 6). The affidavit for that warrant generally includes the same information included in the affidavit for the search warrant for Terry's residence and adds information regarding the currency and marijuana derivatives found during the search of Terry's residence.

On September 24, 2020, a grand jury returned an Indictment charging Terry with several counts of distribution and conspiracy to distribute marijuana between April 21, 2013, and April 21, 2020. (Filing No. 1). On the same date, the undersigned magistrate judge issued a seizure warrant authorizing the seizure of a 2018 Chevrolet Suburban owned by Terry. (Ex. 7). Terry was arrested on September 28, 2020, on a federal arrest warrant issued in connection with the Indictment. Officers recovered a second cell phone from Terry's person on this date and obtained a federal search warrant for that phone on October 1, 2020. (Ex. 8).

Terry has filed the instant motion seeking suppression of all statements he made during his custodial interrogation on April 21, 2020, and any evidence obtained from the search warrants that relied on his improperly obtained statements. Specifically, Terry contends he was subjected to custodial interrogation without being advised of *Miranda* and that he unequivocally invoked his right to counsel, which officers did not "scrupulously honor." (Filing No. 36 at pp. 7-8). As to the search and seizure warrants for Terry's residence, phones, and Chevy Suburban, Terry argues the warrants are rendered "fatally defective" by the inclusion of his statements obtained from his

interrogation without *Miranda* warnings, and that probable cause would not exist but-for his improperly obtained statements. (Filing No. 36 at pp. 9-10; TR. 108-109). Terry separately argues the seizure warrant for the Chevrolet Suburban did not establish a clear nexus between any alleged illegal activity and the funds used to purchase the Suburban. (Filing No. 36 at p. 11).

The government opposes Terry's motion to suppress his post-*Miranda* statements, arguing such statements were knowingly and voluntarily made after he received a *Miranda* advisement. (Filing No. 57 at p. 11). The government contends Terry's statement regarding a lawyer was both conditional and equivocal. (Filing No. 57 at pp. 12-13). As to the warrants, the government argues a *Miranda* violation does not demand suppression of physical evidence. (Filing No. 57 at pp. 14-15). The government also argues that Terry failed to allege that the inclusion of his pre-*Miranda* statements in the warrant affidavit was material or made with reckless disregard for the truth as required under *Franks v. Delaware*, 438 U.S. 154 (1978), but even if Terry' statements were excised from the warrant affidavits, probable cause would nevertheless still exist. (Filing No. 57 at pp. 16-17). Finally, the government asserts that were the search warrants found to have been improperly issued, the application of the "good faith" exception to the exclusionary rule would apply. (Filing No. 57 at p. 18).

## ANALYSIS

### I.    Statements Made During April 21, 2020, Interrogation

As an initial matter, the government does not contest Terry's motion to suppress as to statements he made in custody on April 21, 2020, prior to receiving a *Miranda* advisement at 9:27 p.m. (TR. 8-9; Filing No. 57 at pp. 6-11 – discussing only post-warning statements). There is no dispute that Terry was "in custody" when he was placed in the interview room at OPD Central Station around 6:07 p.m. on April 21, 2020, as all three officers testified that Terry was arrested, in custody, and was not free to leave. It is also not disputed that Terry was subjected to interrogation at that time. See *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)("'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."). Finally, the record is clear that no *Miranda* rights advisement was provided to Terry prior to 9:27 p.m., which the officers testified was a mistake or oversight. Accordingly, Terry's

pre-*Miranda* statements made during his April 21, 2020, interview are inadmissible in the government's case-in-chief, as they were obtained in violation of the Fifth Amendment. See *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012)("Officers must inform suspects of their *Miranda* rights before subjecting them to custodial interrogations. Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief."); see also *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

        The primary dispute is whether Terry's post-*Miranda* statements must also be suppressed. This hinges on whether Terry's statement at the outset of the interview, "Before I do anything else to incriminate myself any further, I, I think I need a lawyer present," was an unambiguous, unequivocal invocation of his right to counsel. If Terry's request for counsel was unambiguous and unequivocal, then pursuant to *Edwards v. Arizona*, 451 U.S. 477 (1981), Terry's post-*Miranda* statements must also be suppressed because he was not subject to further interrogation until counsel was made available to him, regardless of the subsequent *Miranda* advisement and waiver. See *Edwards*, 451 U.S. at 484-85 (holding that once a suspect "expresse[s] his desire to deal with the police only through counsel, [the suspect] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police."). If, however, Terry's request was ambiguous or equivocal, then officers were not required to cease questioning, *Davis v. United States*, 512 U.S. 452, 452, (1994)("[I]f a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect"), and the admissibility of Terry's post-warning statements depends on whether they were knowingly and voluntarily made pursuant to *Oregon v. Elstad*, 470 U.S. 298, 299 (1985)("[A]bsent deliberate coercion in obtaining an unwarned statement, a careful and thorough administration of *Miranda* warnings cures the condition that rendered the prior unwarned statement inadmissible."). After careful and thorough review of the audio-video recording of Terry's interrogation, the undersigned magistrate judge finds that a reasonable police officer in these circumstances would have understood Terry's statement to be a request for an attorney; that the officers, not Terry, reinitiated communication and interrogation after his invocation; and that at no point during the interview was

Terry provided an opportunity to contact an attorney. Therefore, Terry's post-*Miranda* statements must also be suppressed.

The Supreme Court held in *Miranda* that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning[.]" *Davis*, 512 U.S. at 457 (citing *Miranda*, 384 U.S. at 469-73). The right to counsel established by *Miranda* was one of the "procedural safeguards" to "insure that the right against compulsory self-incrimination was protected." *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 443-44 (1974)). The Supreme Court has held *Miranda*'s right to counsel "is sufficiently important to suspects in criminal investigations. . . that it "requir[es] the special protection of the knowing and intelligent waiver standard." *Id.* at 458 (quoting *Edwards*, 451 U.S., at 483)(alteration in original). Therefore, the Supreme Court has established a "rigid prophylactic rule" that "if a suspect requests counsel at any time during [an] interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484-85); see also *Fare v. Michael C.*, 442 U.S. 707, 719 (1979)("[T]he Court fashioned in *Miranda* the rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease."). "This second layer of prophylaxis for the *Miranda* right to counsel . . . is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights . . . To that end, [the Supreme Court] ha[s] held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." *Davis*, 512 U.S. at 458 (internal citations and quotation marks omitted).

The applicability of *Edwards*' "rigid prophylactic rule" requires the court to first "determine whether the accused *actually invoked* his right to counsel." *Davis*, 512 U.S. at 458 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984))(emphasis in original). "[T]his is an objective inquiry." *Id.* at 459 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991); see also *Davis*, 512 U.S. at 459. The suspect's request for counsel must be unambiguous and articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is

ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers are not required to end questioning. *Id.* (emphasis in original). A court is required "to give a broad, rather than a narrow, interpretation to a defendant's request for counsel" and interpretation of a defendant's statement "is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Barrett*, 479 U.S. at 529 (internal citation omitted).

The Eight Circuit historically has not broadly construed defendants' requests for counsel during custodial interrogation. For example, in *United States v. Mohr*, the Eighth Circuit found a defendant's statement, "Should I get a lawyer at this time? . . . I think I should get one" was equivocal, comparable to the phrase "maybe I should talk to a lawyer," which the Supreme Court found to be equivocal in *Davis*.[7] *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014)(citing *Davis*, 512 U.S. at 462); *but see Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991)(finding the suspect's statement, "I think I should call my lawyer," was an unequivocal request for counsel). The Eighth Circuit in *Mohr* also found the defendant's subsequent statement, "I want my lawyer. . . [I]f you want this recorded, I want a lawyer present" was conditional because "a reasonable officer could have understood [the defendant's] statement to mean he was only requesting a lawyer if the interview was going to be recorded," which it was not. *Mohr*, 772 F.3d at 1146; *accord Barrett*, 479 U.S. at 529 (finding the defendant's statements that he "would not give a written statement unless his attorney was present" while also stating he would verbally talk about the incident was not an unequivocal or unconditional invocation of counsel); *but see Edwards*, 451 U.S. at 479 (finding the suspect's statement, "I want an attorney *before making a deal*," was an unequivocal and unambiguous invocation of counsel)(emphasis added).

Similarly, in *United States v. Havlik*, the Eighth Circuit found a reasonable officer could have understood the defendant's statement, "I don't have a lawyer. I guess I need to get one, don't I?" to be "a request for advice about whether to seek counsel, rather than a request for counsel." *United States v. Havlik*, 710 F.3d 818, 821-22 (8th Cir. 2013); *accord Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001)(finding the statement, "Could I call my lawyer?" was not an unambiguous request for counsel because under the circumstances a reasonable officer could have believed the suspect was "merely inquiring whether he had the right to call a lawyer"); *but see*

---

[7] But when the defendant in *Davis* later stated, "I think I want a lawyer before I say anything else," *officers terminated the interview*. See *Davis*, 512 U.S. at 455.

*United States v. Hunter*, 708 F.3d 938, 945 (7th Cir. 2013)(finding the suspect's statement, "Can you call my attorney?" was an unequivocal invocation when considering prior context). The defendant in *Havlik* later stated, "I guess you better get me a lawyer then" when he was advised that an attorney would be appointed for him if he could not afford one—a statement the Eighth Circuit also found equivocal due to the defendant's use of the phrase, "I guess." See *id.* at 822; *cf. Smith*, 469 U.S. at 96-97 (finding the defendant's statement, "Uh, yeah, I'd like to do that" after being advised of his right to counsel's presence during questioning was an unequivocal and unambiguous invocation of counsel).

Turning now to the circumstances of this case, the undersigned magistrate judge must determine whether Terry's statement, "Before I do anything else to incriminate myself any further, I, I think I need a lawyer present," was an actual invocation of his right to counsel articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." See *Davis*, 512 U.S. at 459; *see also Smith*, 469 U.S. 91, 97-98 ("A statement either is such an assertion [of the right to counsel] or it is not."). The government argues Terry's use of the phrase, "I think" renders his statement equivocal and ambiguous, similar to the defendant's equivocal statement in *Mohr*, "I think I should get one." True, a suspect's use of words such as "think" can indicate the suspect is contemplating or equivocating as to whether he "might" be invoking the right to counsel. See, e.g., *United States v. Williams*, 446 F. App'x 587, 589-90 (4th Cir. 2011)(concluding a suspect's statement, "I don't think I want to say anything more until I talk to a lawyer," was not a clear and unequivocal invocation). But, the context of the suspect's statement is key—the standard is whether a reasonable police officer *in the circumstances* would understand the statement to be a request for an attorney. See *Davis*, 512 U.S. at 459 (emphasis added). In *Williams*, for example, the suspect's statement was ambiguous in part because he continued speaking about his crimes unprompted by officers immediately after stating he did not "think" he wanted to say anything more until he talked to a lawyer; under the circumstances, "an objective listener could not have known anything more than that [the defendant] 'might' have wanted the assistance of counsel[.]" *Williams*, 446 F. App'x at 590. And in *Mohr*, the suspect's statement "I think I should get one" was preceded by a question— "Should I get a lawyer at this time?" A reasonable officer in those circumstances could think the suspect was asking for an opinion or "advice about whether to seek counsel," rather than actually

requesting counsel since the suspect asked a question. *Mohr*, 772 F.3d at 1146; see also *Havlik*, 710 F.3d at 821-22 ("I guess I need to get [a lawyer], don't I?").

Conversely, in *Wood v. Ercole*, the Second Circuit concluded the suspect's statement, "I think I should get a lawyer" was an unequivocal, unambiguous request for an attorney "evidenc[ing] no internal debate whatsoever." *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011). The suspect did not say, "perhaps I should get a lawyer" or "maybe I need a lawyer," and the "circumstances surrounding the interrogation erase[d] any possible ambiguity" in the statement. *Id.* The Second Circuit discussed that the ordinary usage of the word "think" does not necessarily undermine a request for counsel, explaining, "Absent special circumstances, a reasonable observer hearing the phrase 'I think we should go to a movie' would not believe that the speaker actually wanted to stay home or go to a baseball game, or that the speaker was engaged in an internal debate rather than expressing a preference." *Id.*

Here, the undersigned magistrate judge finds that a reasonable officer in these circumstances would have understood Terry's statement to be a request for an attorney. Officers first began speaking to Terry after his arrest at 6:48 p.m. For approximately three minutes, officers "lay out" to Terry what they observed during their investigation and surveillance preceding his arrest, and tell him he "ain't gonna skate," he is going to prison, and he "will lose everything in [his] life the way it is now." Terry begins to say he was just "walking down the street" when Sgt. Hanson interrupts to tell Terry "stop" and not to lie. Immediately after Sgt. Hanson makes this statement, without the benefit of a formal *Miranda* advisement and unprompted by law enforcement, Terry says, "Before I do anything else to incriminate myself any further, I, I think I need a lawyer present." Terry's statement was not posed as a question to officers asking for advice as to whether he "should" get a lawyer. *Cf. Mohr*, 772 F.3d at 1146 ("Should I get a lawyer at this time?"). Nor does Terry say he "maybe" or "might" want a lawyer, and his tone does not suggest he was simply thinking out loud or contemplating whether he may want a lawyer at some ill-defined point in the future. *Cf. Davis*, 512 U.S. at 462 ("Maybe I need a lawyer"). And, Terry's statement was not made in response to a *Miranda* advisement that he has a right to an attorney, which negates any reasonable inference Terry was engaged in some sort of internal debate or decision as to whether he might need a lawyer upon learning he had a right to one. Instead, unadvised and unprompted, Terry interrupted Sgt. Hanson to state he "need[s] a lawyer *present*." And, Terry "need[s]" that lawyer present "before he incriminates [himself] further." In the context in which he made his statement,

no reasonable officer could believe Terry's addition of "I think" was evidence of uncertainty or equivocation. To the contrary, Terry's statement was definitive and categorical, demonstrating Terry recognized that officers were seeking to interrogate him and that he wanted an attorney *present* so he did not incriminate himself further. A criminal defendant is not required to "speak with the discrimination of an Oxford don" in order to invoke their right to counsel, *Davis*, 512 U.S. at 476 (Souter, J., concurring in judgment), so long as he "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Under the circumstances, the undersigned magistrate judge finds that Terry's statement was sufficiently clear and unambiguous such that a reasonable officer would understand it to be a request for an attorney.[8] See also *Barrett*, 479 U.S. at 529 (requiring courts "to give a broad, rather than a narrow, interpretation to a defendant's request for counsel;" interpretation of a defendant's statement "is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous.").

The government further contends Terry's statement, "Before I incriminate myself further," renders his request for counsel "conditional." But, protection against self-incrimination *is the very reason Miranda* established the right to counsel during custodial interrogation. Unlike a suspect's request for a lawyer "if the interview was going to be recorded," see *Mohr*, 772 F.3d at 1146, or a suspect's statement he will not "give a written statement" without an attorney present, see *Barrett*, 479 U.S. at 529, Terry's statement he needed a lawyer present "Before I incriminate myself further" is, in essence, the exact constitutional right sought to be protected by cases such as *Miranda* and *Edwards*. See *Davis*, 512 U.S. at 457 ("The right to counsel established in *Miranda* was one of a series of recommended procedural safeguards . . . to insure that the right against compulsory self-incrimination was protected."). Terry clearly expressed a desire for a lawyer to be "present" for the same reason the Supreme Court established the procedural safeguards in *Miranda*—"[t]o give force to the Constitution's protection against compelled self-incrimination[.]" *Florida v. Powell*, 559 U.S. 50, 59 (2010). Under these circumstances, no reasonable police officer could understand Terry's statement to be a conditional request for counsel.

Once a suspect invokes his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

---

[8] The officers testified as to their subjective opinions of what Terry's statement about a lawyer meant. (TR. 50, 57-58, 70-71, 96). But, whether a suspect has invoked counsel is an objective rather than subjective standard; therefore, the officers' testimony regarding what they personally believed Terry meant does not factor into the analysis.

communication[.]" *Edwards*, 451 U.S. at 484-85; see also *Smith*, 469 U.S. at 98 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease."). Here, Terry clearly requested counsel and stopped speaking. In response to Terry's statement, officers initiated further communication, making remarks that appear designed to persuade Terry to waive his previously asserted right, telling him, "This isn't just a routine traffic stop where there is marijuana in the car," and that although they "understand that is your right to have a lawyer . . . this isn't just any normal case where you just do a traffic stop and you have two people in the vehicle," and that "right now your house is surrounded." Officers continue to explain their investigation and told Terry "how fucked you are" and that his "best play is to cooperate" in which case he may not be indicted. These statements convey that Terry would be better off if he kept talking instead of waiting for the lawyer he had just requested. The "rigid prophylactic" rule established by *Edwards* "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]" *Davis*, 512 U.S. at 458.

SA Mann's belated *Miranda* advisement at 9:27 p.m. and Terry's apparent waiver is of no consequence because once a suspect "invoke[s] his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484; see also *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)("[I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."). Once Terry invoked his right to counsel and stopped speaking, officers could not reinitiate questioning and obtain a valid waiver of *Miranda*; the only constitutionally permissible thing officers could do was provide Terry an opportunity to have an attorney present for questioning, which they did not do. See, e.g., *United States v. Horton*, No. 4:08-CR-3005, 2009 WL 1872612, at *5-6 (D. Neb. June 30, 2009)(finding that, "while the defendant's ultimate waiver [of *Miranda*] may have been voluntary and knowing, . . . it arose from a violation of the prophylactic requirements of *Edwards*.").

In sum, the undersigned magistrate judge finds Terry unambiguously and unequivocally invoked his right to an attorney, law enforcement officers impermissibly continued to interrogate

him, and Terry's subsequent waiver of *Miranda* during the same interview without being provided an opportunity to consult counsel was invalid. Accordingly, the undersigned magistrate judge finds that all statements Terry made during his April 21, 2020, interrogation should be suppressed in the government's case-in-chief.

## II. Evidence Obtained from Warrants

Terry further argues the evidence obtained from the search and seizure warrants for his residence, cell phones, and Chevy Suburban must be suppressed because the affidavits for the warrants include his statements obtained in violation of *Miranda*. Terry asserts that because the affidavits for the warrants "relied on these improperly obtained statements," the search warrants were rendered "fatally defective." (Filing No. 36 at pp. 9-11; TR. 108-109).

In applying the exclusionary rule, the Eighth Circuit has held "[t]he sufficiency of a warrant affidavit which contains information from an *unlawful search* [in violation of the Fourth Amendment] is evaluated after deleting that information." United States v. Davis, 760 F.3d 901, 903 (8th Cir. 2014)(emphasis added). But, Terry does not cite, nor has the undersigned found, any Eighth Circuit or Supreme Court cases extending the exclusionary rule to require a court to evaluate the sufficiency of a warrant affidavit after deleting information obtained in violation of *Miranda*. And, a plurality of the Supreme Court in *United States v. Patane* has concluded the exclusionary rule does not apply to physical evidence obtained from a voluntary statement obtained in violation of *Miranda*. See United States v. Patane, 542 U.S. 630, 636-37 (2004)(plurality opinion)("[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. . . . For this reason, the exclusionary rule articulated in cases such as *Wong Sun* does not apply."); see also, United States v. Beasley, 688 F.3d 523, 531 (8th Cir. 2012)(citing Patane, 542 U.S. at 633-34)("Even if we assume a *Miranda* violation, suppression of the resulting physical evidence is not the appropriate remedy."); accord United States v. Fleck, 413 F.3d 883, 893 (8th Cir. 2005)("In this circuit, we have refused to extend the fruit-of-the-poisonous-tree doctrine to exclude physical evidence derived from a voluntary statement made in the wake of a *Miranda* violation.").

Nevertheless, Terry's *only* statement included in the first warrant affidavit for his residence is the information, "Post-*Miranda*, Terry indicated there was $60,000 in U.S. currency as well as

THC (shatter) in a safe inside his residence[.]" (Ex. 5). Even if this statement was deleted from the affidavit, the affidavit nevertheless contained more than sufficient probable cause to issue the warrant. See *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)(citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983))("Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.").

Aside from Terry's statement, the affidavit contained the following information: members of the OPD and ATF received information Terry was distributing large amounts of marijuana from his residence; on April 21, 2020, officers established surveillance of Terry's residence; during that surveillance officers observed Terry exit a black Chevy Impala registered to Dailey to retrieve a large black duffle bag from Terry's garage, which he then placed into the Impala's trunk; officers maintained a visual on the Impala once it left Terry's residence and observed the Impala commit a lane change violation; officers apprehended Terry on foot after he was seen exiting the Impala; an OPD K-9 Unit conducted a traffic stop of the Impala, during which the drug canine gave a positive indication for the presence of an illegal narcotic; and during a subsequent search of the Impala officers recovered a large black duffle bag in the trunk that contained 30 pound of marijuana and another duffle bag in the back seat containing 19 pounds of marijuana. "Search warrant [a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir. 2002)(quotations and citations omitted). An issuing judge's determination of probable cause "should be paid great deference by reviewing courts." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010). Even without Terry's statement, the information contained in the affidavit established probable cause to issue a warrant for Terry's residence.

The subsequent warrants issued for Terry's two cell phones contains the same information that was in the affidavit for his residence, plus the additional information that officers recovered $116,000 in United States currency, containers of marijuana, THC edibles and wax, and other items consistent with drug sales during the search of Terry's residence. Therefore, probable cause also exists for the issuance of those warrants, with or without Terry's statement.

Finally, Terry's brief raises the issue that, as to the seizure warrant for the Chevrolet Suburban, "there is no clear or sufficient nexus between monetary payments or other financial transactions identified that demonstrate these funds were tied to any illegal activity of Terry."

([Filing No. 36 at p. 11](#)). Terry's argument as to the Chevrolet Suburban appears to be more akin to a motion to return seized property subject to forfeiture under Rule 41(g) of the Federal Rules of Criminal Procedure rather than a motion to suppress evidence. Regardless, the undersigned magistrate judge—both at the time he reviewed the application on September 24, 2020, and now—finds that probable cause existed to authorize the seizure of the Suburban. See Ex. 7.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Evidence ([Filing No. 35](#)) be granted, in part, as to statements he made on April 21, 2020, during his custodial interrogation, and in part denied as to physical evidence obtained from the search and seizure warrants.

Dated this 17th day of June, 2021.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR [59.2](#), any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.